(Decided 20th June, 1893.)

---

# CHARLES BILLINGSLEA *vs.* JOHN S. SMITH and HARVEY PRIDE, trading as SMITH & PRIDE.

*Brokers— Witness — Refreshing memory — Evidence — Commission to take Testimony—Sale on Margins—Arrest of Judgment.*

Brokers who are employed to buy certain stocks for a person, have a discretion as to the place where, and the person from whom they may purchase, provided they use their discretion in good faith for the interest of their principal.

A witness being asked in respect of certain transactions had with a corporation of which he was an officer, answered that he was only able to state them by refreshing his memory from entries made at the time in the books of the corporation; that he knew they were correct at the time they were entered; that it was impossible for him to state whether he or some other officer of the corporation made all the purchases or sales; but he knew they were correctly entered on the records at the time they were made. HELD:

That the witness should be allowed to refresh his memory from the entries made at the time of the transactions, and to testify in regard to the same.

The rules of Court provide that the party applying for a commission shall serve on the opposite party a copy of his interrogatories, and "the name or names of the commissioners, and if the opposite party shall not within fifteen days thereafter file cross in-

Billingslea *vs.* Smith and Pride.

terrogatories, together with the name or names of a commissioner or commissioners on his part, the commission shall issue to the commissioner or commissioners named by the party applying for the commission." HELD :

That if the defendant neglected to name another commissioner on receiving notice of the name of the plaintiffs' commissioner, such neglect must be considered as a waiver of his right to have two commissioners, and a consent to the execution of the commission by the one named.

A contract for the purchase of stock with the understanding that, in case of a decline in the market price, the purchaser is to pay the difference between the contract price and the market price, with no intention that he shall receive and pay for the stock itself, is a gambling contract, on which the law will not permit an action to be maintained.

In an action by copartners, the use of the names of both plaintiffs after the suggestion of the death of one of them, although an irregularity, is not fatal to the judgment.

Where after a rule is laid on the plaintiffs to file a bill of particulars, the defendant pleads to the merits before the rule has been complied with, such failure to comply with the rule furnishes no ground for arrest of judgment.

APPEAL from the Circuit Court for Carroll County.

The following letters are added to the statement of the case contained in the opinion of the Court:

Westminster, Md.,
Nov. 7th, '90.

Messrs. Smith & Pride,
Baltimore, Md.

Gentlemen:—I sent you check yesterday for $380. I send you check to-day for $300, amt., mrgn. called for in yours of the 6th. I understand the mkt. is panicy to-day. Expect to be in Baltimore Monday and will bring amts. with me to meet mgns. to date.

Yours Truly,
CHARLES BILLINGSLEA.

Billingslea *vs.* Smith and Pride.

Westminster, Md.,
Nov. 8th, '90.

Messrs. Smith & Pride,
　　Balto., Md.
　　　　　Gentlemen:
　　　　　　　As I understand it
$900 will remargin my Stks to figures named in your
statement of Nov. 7th, '90.

Please let me know if this is not correct, and continue
to protect my Stks, and oblige,

　　　　　Yours Truly,

　　　　　　Charles Billingslea.

P. S.—I send herewith check for $900.

　　　　　　　　　　　C. B.

| No. 310 C. Gas | 37'4 | $ 100 |
| " 312 N. P. | 69'4 | 200 |
| " 314 " | 69 | 600 |
| | | $ 900 |

The cause was argued before ROBINSON, BRYAN, FOW-
LER, and McSHERRY, J.

*Wm. H. Thomas,* and *Wm. P. Maulsby,* for the appel-
lant.

*Henry M. Clabaugh,* and *John Henry Keene, Jr.,* for
the appellees.

BRYAN, J., delivered the opinion of the Court.

Smith and Pride brought suit against Charles Bil-
lingslea in the Circuit Court for Carroll County. The
declaration contained the common counts for goods sold,
for work done, for money lent, for money paid by plain-
tiffs for defendant at his request, for money received by
defendant for the use of the plaintiffs, and for money
found to be due on accounts stated. The following

Billingslea *vs.* Smith and Pride.

account was filed with the declaration, verified by the affidavit of the plaintiff, Smith.

Balto.,
Nov. 12th, '90.

Dr. Chas. Billingslea,
In ac. with Smith & Pride.

1890.

Nov. 5. To 100 C. Gas Stock,
   310 bo't at 42¼ .... . $ 4,225.00
   By cash on same.........  500.00
               $ 3,775.00
 " To 100 N. Pac. Stock,
   312 bo't at 74¼..... . $ 7,425.00
   By cash on same........  500.00
               $ 6,925.00
 " To 200 N. Pac. Stock,
   314 bo't at 73.......... $14,600.00
   By cash on same ....... .  800.00
               $13,800.00

               $24,450.00
  Ints. from Nov. 5th to 12th      28.50

               $24,478.50

CREDITS.

Nov. 12. By 100 C. Gas, 310 sold
   out at 39. ...... ...... $ 3,900.00
 " By 100 N. Pac., 312
   sold out at 56......... .  5,600.00
 " By 200 N. Pac., 314
   sold out at 56........ .  11,200.00
               $20,700.00

   Due S. & P......... .     $ 3,778.50

E. & O. E.

On the trial the plaintiff Smith testified to the partnership between himself and Pride as stock brokers in Baltimore, and that in October, 1890, the firm had a transaction with defendant in respect to the buying of stock for him, and that he told defendant where he bought stocks in New York, and of whom he bought stocks; and notice having been given to defendant to produce an original paper which witness had sent by mail to defendant, and defendant failing to produce it without giving any reason, the plaintiff offered in evidence the following paper:

S. & P.

H. Pride & Co., Brokers, will receive no business except with the understanding that the actual delivery of property bought or sold is, in all cases, intended, agreed and understood. Deliveries in grain and provisions made in accordance with the rules of the Chicago Board of Trade.

Baltimore, Md., Sept. 5, 1890.          18          No. 100.
    H. Pride, Broker,          Telephone 289–3.
11 South Street, (up stairs.)          Smith & Pride,
                            Stock Brokers.

Has Bought for Account and Risk of—

| Amount. | Month. | Article. | Price. | Margins. | Exhaust. |
|---------|--------|----------|--------|----------|----------|
| 25.     | Mop.   | —        | 71'4.  | —        | 10'4.    |

This order filled by
New York Stock and Produce
  · Clearing House Company,
    18 Broadway, New York,

and the witness gave evidence that this paper was a *fac simile* in every respect of the one sent to defendant, except that said paper contained the accounts of stocks bought as shown in the account filed with the declara-

tion, and that said paper was sent to the defendant on or about November 5th, 1890. The witness further testified that on November 5th, 1890, he received by telephone in Baltimore from Westminster an order to buy the stocks above mentioned, and on the same day purchased them by means of a telegram from Baltimore to the New York Stock and Produce Clearing House Company, 18 Broadway, New York, and purchased the same through said company, and that it was the universal custom among the brokers in Baltimore to buy and sell stocks through New York brokers for their customers, and that it is the universal custom among brokers to sell out stocks when the customer does not keep-up the margin. A number of letters were then offered in evidence in reference to the dealings between the parties to this suit all of them written by the plaintiffs, except one. The testimony of Smith is further stated in the bill of exceptions as follows: "The said witness then proved that Harvey Pride, one of said partners, stated to the defendant in the presence of said witness, the terms of the contract between the plaintiffs and the said New York Stock and Produce Clearing House Company, and notified defendant that he would be charged with interest after 1st November, 1890, on the full price of stock bought; that said Pride stated to defendant the terms on which said stock would be bought a month or two before the transaction in the stocks in question; that the plaintiffs and defendant had several transactions before that of the 5th of November, 1890; that the stocks in question were purchased on the 5th of November, 1890, as before stated, through telephone in the office of William B. Thomas in Westminster to the office of the plaintiffs in Baltimore. The plaintiffs then offered to read in evidence an original entry made by plaintiffs on a paper called a 'scratch sheet' kept by them to prove that the stocks in question were purchased on the

5th of November, 1890, and to prove an order from the
defendant to purchase the same on said day; but the
defendant objected to said proof offered and the Court
admitted the same for the purpose of refreshing the
memory of the witness, the witness having proved that
this paper called 'scratch sheet' contained original entries
of transactions made by him at the very time of the
transactions, and he knew it to be correct, and upon
looking at it remembered the transactions with the
defendant here in question, independent of the paper."
The witness then testified that he recollected the defend-
ant's order to buy the stocks mentioned in the account
filed with the declaration; that defendant gave the order
through telephone, that he mailed to the defendant on
the evening of November 5th, 1890, the *fac simile* of the
paper above mentioned marked "S. & P." which contained
a statement of these purchases; and that he received
from the defendant payments of money on November
7th, 8th and 10th, that this transaction was *"closed out"*
on November 12th at the Stock Exchange in the City of
New York, by the sales of the said stocks on an order
from plaintiffs by telegraph to the New York Stock and
Produce Clearing House Company to sell the stocks; and
that on the same day they deposited for the defendant
thirty-seven hundred dollars in the Franklin Bank of
Baltimore to the credit of the said Clearing House Com-
pany. The contract was not produced which was testi-
fied to have been made by the plaintiffs and the New
York Company, and whose contents, according to
Smith's testimony, were stated by Pride to the defend-
ant. A copy of this agreement was offered in evidence
by plaintiffs under a commission to take testimony, but
it was ruled out by the Court. For the purpose of
illustrating our views, this copy is here inserted:

"New York Stock and Produce

Clearing House Company, Limited.

Capital, $100,000, (Full Paid.)

"Memorandum of Agreement.

"Made this seventh day of July, 1891, between the Platt, Greulich Company, party of the first part, and Smith & Pride, Baltimore, Md., party of the second part.

"Witnesseth, that the said parties do mutually agree as follows:

"1. That the following are the terms and conditions upon which all contracts between them shall be had, unless others shall be agreed upon in writing.

"2. That all property sold by either party to the other is to be delivered as hereinafter stated on payment of the contract price.

"3. That if the advance or decline in the market price of any property beyond the contract price equals or exceeds the cash credits of the party of the second part with the party of the first part, the party of the first part shall thereupon be at liberty to close and terminate the contract as to that property, and any credits the party of the second part may have with the party of the first part may be applied by the party of the first part to any indebtedness of the party of the second part to the party of the first part, and the party of the first part may close and terminate any or all other contracts and apply the payments or deposits and profits to the payment of any such indebtedness.

"4. That the place of delivery of grain and provisions is Chicago, at such houses as the party of the first part may elect, and of all other property the office of the party of the first part in New York City.

"5. That Chicago Warehouse receipts for grain and provisions, and National Trust Co. Pipe Line Cer-

tificates for oil, may be delivered in lieu of the property represented by them.

"6. That the party of the second part has and shall have no authority to act as the agent of the party of the first part, and he shall in no way hold himself out or represent himself to be the agent of the party of the first part.

[Seal.]             L. J. GREULICH,
                            President.
                     SMITH & PRIDE."

A number of letters from defendant to plaintiffs were offered in evidence by plaintiffs dated from October 21st, 1890, to November 17th, 1890. The witness, Smith, further testified that on the night of the eleventh of November he telephoned to Wm. B. Thomas at Westminster to give notice to persons who had stock transactions with Smith & Pride, that he would give them until next morning at ten *o'clock* to put up margins, and that plaintiffs would sell out the stocks next morning if margins were not put up, and that plaintiffs would deliver stocks to any broker in New York if purchasers would pay what was due on them, and that no check came from defendant. Defendant in his testimony stated that he was present in the office of Mr. Thomas when the telephoning took place; but he denied that anything was said about delivery of stocks. Evidence was given that plaintiffs had deposited in the Franklin Bank of Baltimore different sums of money to the credit of the New York Company from November 6th to November 11th in the year 1890, aggregating eight thousand seven hundred and forty-six dollars and seventy-three cents; the deposits on November 11th amounting to five thousand dollars. The plaintiffs offered in evidence testimony taken under a commission which will be more particularly noticed hereafter. This evidence showed that the New York Produce Clearing House Company

Billingslea vs. Smith and Pride.

on November 5th, 1890, purchased for Smith & Pride the stock mentioned in the account filed with the declaration, at the prices named, and that on November 12th, it sold them at prices named in same account; that when stock was sold Smith & Pride deposited in Franklin Bank of Baltimore balance due to New York Company; that the stocks were held by the New York Company, but never delivered to Smith & Pride, and that there was a decline below the price at which they were purchased. It was also stated in this testimony as follows: "Said stocks were not delivered to said plaintiffs, but after holding the said stocks for several days we gave them notice by telegram, and subsequently by letter, that said stocks were ready to be delivered to them, and that they would be held or delivered to any broker or person in New York whom they might name, upon the understanding that they were to pay six per cent. interest upon the full cost of the stock, less partial payments." The defendant testified that he did not deal with the plaintiffs for the actual purchase of stocks for delivery, and that it was understood between them that no stocks were to be bought or delivered, but that they were dealing in the rise and fall of market prices; if the prices advanced he was to receive the difference, if there was a decline in prices, he was to pay the loss; that no shares of stock were ever delivered or proposed to be delivered to him by the plaintiffs. There was other evidence tending to prove the same facts.

Thirty-one exceptions were taken to the rulings of the Court on the evidence. The first exception was taken to the evidence that Smith told defendant that he bought stocks in New York, and that he told him from whom he bought them. Other exceptions were taken to evidence that plaintiffs bought stocks from or through the New York Company. It may be sufficient to say in regard to all these objections that if the plaintiffs were employed

to buy certain stocks for defendant, they necessarily had a discretion as to the place where, and the person from whom they should purchase them; provided they exercised their discretion in good faith for the interest of their principal.   Other exceptions were taken to the admission of the letters of the parties concerning these stock transactions; the letters of plaintiffs which were admitted in evidence being principally *statements of accounts* and demands for margins, and the letters of defendant enclosing checks and referring to margins. Notice was given to defendant to produce the letters sent to him by plaintiffs, and on failure to produce them, proved copies were admitted in evidence; the Court refused to admit any of plaintiffs' letters except those written from November 5th to November 11th inclusive. An exception was taken to the admission of an original entry made by the plaintiffs.   The Court admitted it for the purpose of refreshing the memory of the witness who made the entry, he testifying that he made the entry at the time of the transaction, and that he knew it to be correct, and that upon looking at it. he remembered the transaction in question *independently* of the paper.   A similar exception was taken to testimony taken under the commission.   The witness was asked what transactions he had with plaintiffs between the fifth and twelfth of November, 1890.   He answered as follows: "I am only able to state them by refreshing my memory from entries made at the time in our books and which I know to be correct.   I know that these purchases were made by telegrams, the bulk of our business being done that way.   It has been so long since the purchase and sale was made, that it is now impossible for me to state whether I or some other officer of the corporation made all the purchases or sales, but the records on our books were made at the time the transactions occurred and in the regular course of our business, and I know that the pur-

chases and sales were correctly entered on the records at the time they were made. I will furnish you with a statement." We think that the law on this subject is correctly stated in 1 *Greenleaf on Evidence, section* 436, as follows: "Though a witness can testify only to such facts as are within his own knowledge and recollection, yet he is permitted to refresh and assist his memory, by the use of a written instrument, memorandum, or entry in a book, and may be compelled to do so, if the writing is present in Court. It does not seem to be necessary that the writing should have been made by the witness himself, nor that it should be an original writing, provided, after inspecting it, he can speak to the facts from his own recollection. So, also, where the witness recollects that he saw the paper while the facts were fresh in his memory, and remembers that he then knew that the particulars therein mentioned were correctly stated." In *Green vs. Caulk*, 16 *Md.*, 572, the Court said: "What was supposed to be the ancient rule has been relaxed by more recent decisions; and now it is held not to be necessary that the memorandum should have been made by the witness, but if it was made at the time, or about the time, of the occurrence of the fact recorded in it, and the witness from having then seen and recognized it, as containing the truth, of which he is still convinced, at the time of the trial, he may be examined in regard to it." This case has often been quoted with approval in subsequent opinions. The defendant excepted to the commission, and to the reception of the evidence taken under it. The interrogatories to the witness examined under the commission were served on defendant's attorney on the seventeenth of August, 1891. It does not distinctly appear that they received notice of the name of the commisssoner to whom it was proposed to issue the commission; but on the twenty-fifth of August, they filed exceptions to the interrogatories.

The commission was issued to one commissioner on the nineteenth of October next following. The law requires two commissioners, unless the parties consent that the commission may issue to one alone. *Code, Article* 16, *sections* 227 *and* 228, and *Article* 35, *section* 15. The rule of Court set out in the bill of exceptions provides that the party applying for a commission shall serve on the opposite party a copy of his interrogatories and "the name or names of the commissioners, and if the opposite party shall not within fifteen days thereafter file cross-interrogatories, together with the name or names of a commissioner or commissioners on his part, the commission shall issue to the '*commissioner* or *commissioners*' named by the party applying for the commission." If the defendant received notice of the name of plaintiffs' commissioner, his neglect to name another commissioner must be considered as a waiver of his right to have two commissioners, and a consent to the execution of the commission by the one named. *Sewell vs. Gardner*, 48 *Md.*, 183. It is probable that the record is imperfect in not showing whether defendant had notice that the commission was proposed to be issued to only one commissioner. If such notice was given, the commission was regular and was properly issued. But in the present state of the record we should be obliged to hold that there ought to have been two commissioners, and that therefore the evidence taken under it was inadmissible. After the return of the commission and several months before the trial, exceptions were filed by defendant to the issue of it on the ground that it ought to have been issued to two commissioners instead of one. It is sufficient to say that we see no error in the other rulings on the evidence.

The Court granted three prayers on behalf of the plaintiffs, and also three on behalf of defendant and rejected eight others. The first prayer of plaintiffs,

granted by the Court, was in these words : "The plaintiffs pray the Court to instruct the jury that if they shall find from the evidence in this cause that on or about the 5th day of November, in the year 1890, Joseph S. Smith and Harvey Pride were partners, under the firm name of Smith and Pride, and trading under said name as stock brokers in the City of Baltimore; and shall further find that on the said fifth day of November, 1890, this defendant ordered plaintiffs to purchase the shares of stock mentioned in the account filed with the declaration in this cause; and shall further find that the plaintiffs purchased said stock through their correspondents in the City of New York, at and for the prices named in said account; and shall further find that the New York Stock and Produce Clearing House Company, limited, purchased the said stock at and for the price set out in said account; and shall further find that the New York Stock and Produce Clearing House Company, limited, had the said stocks in their possession and subject to the order of the plaintiffs, upon the payment of the price of the purchase money to it by the plaintiffs, and shall further find that the defendant in good faith and *bona fide* purchased said stocks upon margins as explained by the witnesses; and shall further find that the agreement between plaintiffs and defendant was that if the said stocks declined beneath the contract price, then the defendant was to increase the amount of said margins to the contract price; and shall further find that stock did decline beneath the contract price, and that the defendant was called upon by the plaintiffs to increase his said margins to the amount of the contract price; and shall further find that the defendant failed and refused to put up or advance the said margins necessary to keep up the contract price of the said stock; and shall further find that the plaintiffs demanded of defendant on the night of the 11th of November, 1890, to increase his margins

to the amount of the contract price of the said stock by 10 o'clock the next morning; and shall further find that defendant refused and failed to advance moneys necessary to maintain the contract cost of the stock aforesaid by 10 o'clock of the morning of the 12th of November, 1890; and shall further find that it was the usage, general and notorious among stock broker in the City of Baltimore, that if the purchaser of the stocks failed to keep up the contract price, then the broker so holding shares of stock for the customer, was entitled to sell the same for and on account of the purchaser, provided the said stock was sold at the fair market price; and if they shall further find that the plaintiffs had advanced money to keep up the contract price of the stock for the defendant; and shall further find that the stocks sold for less than the contract price, then their verdict must be for the plaintiffs for such sum as they may find the plaintiffs had laid out and expended in said transactions, and interest may be allowed thereon in the discretion of the jury.'' If the contract between these parties was that the plaintiffs should purchase stocks for defendant without any qualifications, then the plaintiffs cannot recover unless they actually made the purchases, and had the certificates in their possession or under their control, ready to be delivered to the defendant on payment of the purchase money. *Rosenstock vs. Tormey*, 32 *Md.*, 178. The contract is, however, qualified by the statements in the prayer. It is alleged to have been purchased ''*upon margins as explained by the witnesses.*'' The witnesses give diverse explanations of these ''margins.'' The witness, Smith, testified ''that the object and meaning of margin was to protect the plaintiffs, that the usage among brokers is, if the margin fails to be sufficient, then to sell the stock; that the plaintiffs could only buy in New York through their said correspondents; that it was the custom when the

margin was not put up to wire over to New York to sell stocks." The defendant testified: "I put $100 as margin for 100 shares of Northern Pacific. If what I dealt in advanced one point I would have a profit of $100, and that, with the $100 margin, was returned to me less $25 commission. If said stocks would decline one point below which I was margined, I would pay to them $100, and lose the $100 margin." The marginal process described by this last witness would certainly disclose a gambling operation, and the jury were required to consider this testimony and also that of the witness Smith, in determining the character of the purchase. The contract was further qualified by the statement that "the agreement between plaintiffs and defendant was that if the said stocks declined beneath the contract price, then the defendant was to increase the amount of said margin to the contract price." If the margin was such as stated in defendant's testimony, this agreement was simply a method of carrying out a gambling engagement. If the margin was such as described by Smith, the result would not be different if we take into consideration the remaining portion of the prayer, about selling the stock when it declined below the contract price. It is evident that it refers to a case where it was not intended that the stock should be delivered to the defendant and that he should pay for it; but it referred to a case where the intention was that he should lose money which he had risked, if the stock should fall below the contract price. There is no uncertainty about the law on this subject, as held in this State. Where the contract is that in case of a decline in the market price of the stock the purchaser is to pay the difference between the contract price and the market price, and there is no intention that he shall receive and pay for the stock itself, the dealing is a gambling contract, and the law does not permit an action to be maintained upon it. *Stewart vs.*

*Schall, et al.*, 65 *Md.*, 289; *Burt vs. Myer*, 71 *Md.*, 467. We think, therefore, that the Court committed an error in granting this prayer. There were, however, questions which under the evidence might have been submitted to the jury in reference to the dealings between these parties. There was evidence competent to show that the plaintiffs were buying stocks for defendant from the New York Company, and that he knew the terms of the contract between the plaintiffs and the said company, and that having this knowledge, he requested them to protect his stocks, as in letter of November 8th. If the jury found these facts, they might infer that the defendant approved of the terms on which the stocks were purchased under the contract between plaintiffs and the New York Company, and that at his request plaintiffs made advances in cash, or by engagements to pay cash which he afterwards performed, to protect the stocks according to the terms of the contract of purchase. If these facts had been found by the jury, the plaintiffs would have been entitled to a verdict for the amount of their advances, on the count for money paid for the defendant at his request; provided the stocks were actually bought by the New York Company, and held by it for delivery according to the terms of the contract. And as on the hypothesis stated, these advances were made in pursuance of a previous request, it would not have been necessary that the plaintiffs should give any notice to the defendant before making them. But of course, the defendant would be at liberty to show, if he could, that the contract between the plaintiffs and the New York Company was a device for the purpose of disguising a gambling contract. The other two prayers granted on behalf of the plaintiffs are liable to the objections applicable to the first prayer. Two of the prayers granted for defendant present fully the question of the illegality of the contract with the

plaintiffs. The eighth declared certain evidence offered by the plaintiffs to be incompetent. The prayers of the defendant which were rejected were either unnecessary or erroneous.

A motion was made in arrest of judgment and overruled. As the judgment will be reversed, it may not be strictly necessary to consider the question. But as it is of some interest, we will give our opinion on it. The first reason stated in the support of the motion is, that after defendant's plea the death of one of the plaintiffs was suggested, and after the suggestion was made, issue was joined in the name of the plaintiffs, without noticing the death. In this case the cause of action survived to the living plaintiff, and there was no necessity for him to take any steps to establish his right. The Code, Article 75, section 24, protects the action from abatement. After the death of the co-plaintiff had been shown, all other proceedings in the cause should have been in the name of the survivor alone. The use of the names of both plaintiffs was an irregularity; but it was not a fatal error. The use of the name of the dead man could confer no rights on any one, and could do no harm to any one. It was surplusage which ought not to have encumbered the proceedings. The fact of death being suggested on the record, it was as well known to the defendant as to the surviving plaintiff; and if he had any objection to the joinder of issue in the names of the plaintiffs, (using the plural form) he ought to have moved that the joinder should not be received. It would strongly savor of injustice to arrest a judgment under such circumstances. Another reason given for arresting the judgment was, that the plaintiffs had not complied with a rule to file a bill of particulars. After this rule was laid the defendant pleaded the general issue. After pleading to the merits it was too late to object to the failure to comply with this rule. *Randall vs. Glenn,*

2 *Gill*, 436. "It is the office of a bill of particulars to inform the opposite party what is claimed under each count in the *narr.*" *Carter vs. Tuck*, 3 *Gill*, 248. It is obvious that the account filed by the plaintiffs with their declaration, was intended to show everything that they claimed in this suit. So it is impossible to suppose that the defendant could under any circumstances have sustained any injury because the plaintiffs did not file a transcript of it in compliance with the rule laid upon them.

*Judgment reversed, and*
*new trial awarded.*

(Decided 20th June, 1893.)