## SAMUEL COVER vs. JOSEPH S. SMITH.

*Depositions—Objections to the Execution of the Commission—Contract for the Purchase of Stocks on Margin—When Broker May Recover for Advances Made by Him—Gaming Contract—Bona Fides—Question for the Jury—Variance Between Pleading and Evidence.*

Under a commission to take the testimony of non-resident witnesses, interrogatories were filed to be propounded to P. H. Platt. Upon the return of the commission it appeared that the deposition of C. H. Platt was taken. A rule of the trial Court provided that upon the return of a commission and notice to the opposite party, exceptions to the return should be filed before a certain day or be considered waived. No objection was then made to the execution or return of the commission upon the ground of misnomer of the witness, and there was no evidence that the opposite party had been misled as to the identity of the person whose testimony it was in-

tended to take.  *Held*, that the objection that under the above commission the evidence of C. H. Platt could not be taken did not go to the competency of the evidence, but was a question affecting the execution and return of the commission, and that such objection should have been filed at the time designated by the rule of Court and could not be entertained when made long afterwards at the trial of the case.

In the issuing of a commission to take the deposition of non-resident witnesses, if the defendant, after notice of the commissioner proposed by the plaintiff, fails to name another, he waives his right to have two commissioners, and consents to the execution of the commission by the one named.

When a stock broker buys stocks on margin for his customer, and the contract between them is that the purchaser is to pay or receive the difference between the contract price and the market price of the stocks on some future day, and there is no intention that the stocks themselves shall be delivered and paid for, then the transaction is a gambling contract and no action can be maintained on it by the broker to recover advances made by him.

But when the broker actually contracts for the purchase of the stocks from a third party, who holds the same ready for delivery upon payment of the purchase money, and the broker's customer, knowing the facts, requests the broker to make advances by way of margins to the third party, then such advances may be recovered.  In such case, however, the customer may show that the contract between the broker and the third party is a device disguising what is really a gambling contract.

In this case the contract between the plaintiff, a broker, and a third party from whom he bought on margins the stocks ordered by the defendant, provided that all property sold by either party should be delivered on payment of the contract price, and that if the advance or decline in the market price of any property beyond the contract price equals or exceeds the cash credits of the other party, then the contract might be closed and terminated.  This third party testified that the stocks bought for the defendant were closed out at the full market price.  *Held*, that it was for the jury to determine whether the contracts in question for the sale of the stocks were made *bona fide*, or were intended to conceal a gambling transaction.

In an action by a stock broker to recover advances made for defendant in the purchase of stocks on margin, the plaintiff's evidence was that at defendant's request he bought from other parties certain stocks and that these parties actually held the same with the understanding that they were to be delivered on payment of the contract price ; that at the time of the purchase the defendant paid certain margins and agreed to pay such additional margins as might be necessary until the whole purchase money was paid ; that plaintiff paid addi-

tional margins for defendant at his request, and that upon defendant's failure to pay for the stocks or protect the same by additional margins, the same were sold out. The defendant testified that the agreement between him and the plaintiff was for dealings in margins only and that no delivery of the certificates for the stocks was intended. *Held*, that if the transactions were intended to be a dealing in the rise and fall of the market prices of the stocks, and the same were not to be delivered but the differences between the prices on the day of purchase and the prices on the day of settlement to be adjusted, then the plaintiff cannot recover, and that this question was fairly submitted to the jury by the instructions of the trial Court.

The declaration in this case contained the common counts in assumpsit, and the account filed with the declaration charged the defendant with the purchase price of certain stocks less the margins paid by him and credited him with the amounts realized by their sale. *Held*, that although the account did not state that the balance was the amount paid by the plaintiff for the defendant at his request, yet it gave the defendant notice of the character of the claim made, and the question of variance between the pleadings and evidence could not be raised by a general prayer that under the pleadings and evidence the plaintiff was not entitled to recover.

Appeal from the Circuit Court for Washington County. The facts appear in the opinion of the Court. The account filed with the declaration in this case is as follows :

BALTIMORE, Nov. 12, 1890.

MR. SAMUEL COVER,
      *In account with* SMITH & PRIDE.

1890.

| | | | | | | |
|---|---|---|---|---|---|---|
| Sept. 18. | To 10 M. Pac. Stock bought at 69⅓...$ | 692 | 50 | | | |
| " " | By cash, dividend on same.............. | 50 | 00 | 642 | 50 | |
| " " | To 25 M. Pac. Stock bought at 69¼... | 1,731 | 25 | | | |
| " " | By cash and dividend on same.......... | 125 | 00 | 1,606 | 25 | |
| " " | 25 C. C. C. Stock bought at 68⅛....... | 1,721 | 87 | | | |
| " " | By cash and dividend on same.......... | 200 | 00 | 1,521 | 87 | |
| " " | 50 Mo. Pac. Stock bought at 77¼ .... | 3,862 | 50 | | | |
| " " | By cash paid on same...................... | 400 | 00 | 3,462 | 50 | |
| " 22. | 25 Mo. Pac. Stock bought at 76½...... | 1,912 | 50 | | | |
| " " | By cash paid on same..................... | 200 | 00 | 1,712 | 50 | |
| " 29. | 25 N. Pac. Stock bought at 76¼......... | 1,906 | 25 | | | |
| " " | By cash paid on same...................... | 175 | 00 | 1,731 | 25 | |

| | | | | |
|---|---|---|---|---|
| Sept. 30. | 50 N. Pac. Stock bought at 73½ ........ | 3,675 | 00 | |
| " " | By cash paid on same......................... | | 250 | 00 | 3,425 00 |
| " " | 50 N. Pac. Stock bought at 73½.......... | 3,675 | 00 | |
| " " | By cash paid on same......................... | | 250 | 00 | 3,425 00 |
| " " | 50 N. Pac. Stock bought at 73........... | 3,650 | 00 | |
| " " | By cash paid on same......................... | | 200 | 00 | 3,450 00 |
| Oct. 31. | To 50 N. Pac. Stock bought at 73¼.... | 3,662 | 50 | |
| " " | By cash paid on same......................... | | 200 | 00 | 3,462 50 |
| " " | To 40 Ch. Gas Stock bought at 41⅛.. | 1,645 | 00 | |
| " " | By cash and dividend on same.......... | | 160 | 00 | 1,485 00 |
| Nov. 6. | To 100 N. Pac. bought at 73.............. | 7,300 | 00 | |
| " " | By cash paid on same......................... | | 400 | 00 | 6,900 00 |
| " " | To 100 N. West Stock bought at 106..10,612 50 | |
| " " | By cash paid on same........................... | | 200 | 00 | 10,412 50 |
| " " | To 100 Ch. Gas Stock bought at 42½.. | 4,225 | 00 | |
| " " | By cash paid on same......................... | | 500 | 00 | 3,725 00 |
| " " | To interest on $37,011, from Nov. 1st to Nov. 12th............................................ | | | | 64 07 |
| " 12. | To Check Ref. a protect........................ | 1,799 | 43 | 1,799 43 |
| | | | | $48,825 37 |

CREDITS.

| | | | | |
|---|---|---|---|---|
| Nov. 12. | By 10 Mo. Pac. $714, sold out $ 64... | 640 00 |
| " " | " 25 " " 715, " " 64... | 1,600 00 |
| " " | " 25 C. C. C. 154, " " 59⅜. | 1,484 37 |
| " " | " 50 Mo. Pac. 718, " " 56... | 2,800 00 |
| " " | " 25 " " 184, " " 56... | 1,400 00 |
| " " | " 25 " " 200, " " 56... | 1,400 00 |
| " " | " 50 " " 296, " " 56... | 2,800 00 |
| " " | " 50 " " 298, " " 56... | 2,800 00 |
| " " | " 50 " " 300, " " 56... | 2,800 00 |
| " " | " 50 " " 302, " " 56... | 2,800 00 |
| " " | " 100 " " 316, " " 56... | 5,600 00 |
| " " | " 40 Chi. Gas 306, " " 39... | 1,560 00 |
| " " | " 100 " " 370, " " 39... | 3,900 00 |
| " " | " 100 N. West 318, " " 105...10,500 00 |
| | | | $42,084 37 |

The contract referred to in the opinion of the Court between the plaintiffs and the parties from whom they bought

the above mentioned stocks for the defendant was as follows :

" Memorandum of agreement made this seventh day of July, 1890, between the New York Stock and Produce Clearing House Company, Limited, party of the first part, and Smith & Pride, party of the second part. Witnesseth that the said Baltimore, Maryland, parties do mutually agree as follows : 1. That the following are the terms and conditions upon which all contracts between them shall be had unless others shall be agreed upon in writing. 2. That all property sold by either party to the other is to be delivered as hereinafter stated on payment of the contract price. 3. That if the advance or decline in the market price of any property beyond the contract price equals or exceeds the cash credits of the party of the second part with the party of the first part, the party of the first part shall thereafter be at liberty to close and terminate the contract as to that property ; and any credits the party of the second part may have with the party of the first part may be applied by the party of the first part to any indebtedness of the party of the second part to the party of the first part. And the party of the first part may close and terminate any or all other contracts and apply the payments or deposits and profits to the payment of any such indebtedness. 4. That the place of delivery of grain and provisions is Chicago, at such houses as the party of the first part may elect, and of all other property the office of the party of the first part in New York City. That Chicago warehouse receipts for grain and provisions and National Transit Company, Pipe Line certificates may be delivered in lieu of the property represented by them. 6. That the party of the second part has and shall have no authority to act as the agent of the party of the first party, and that he shall in no way hold himself out or represent himself to be the agent of the party of the first part. L. J. Grenlich, president. Smith & Pride."

The following prayers were offered at the trial :

*Plaintiff's 1st Prayer.*—That if the jury find from all the evidence in the case.   First.  That in May, 1890, Joseph S. Smith, the plaintiff, and Harvey Pride were partners, trading in the city of Baltimore, as brokers, under the style of Smith & Pride.   Second.  That while so trading the said Smith & Pride in good faith entered into the agreement in writing offered in evidence between Smith & Pride and the New York Stock and Produce Clearing House Company, Limited, and in good faith for the purchase, sale and delivery of stocks.   Third.  That the defendant had knowledge of the terms of said agreement.   Fourth.  That with such knowledge the defendant instructed Smith & Pride to purchase stocks for him through the said New York Stock and Produce Clearing House Company, Limited.   Fifth.  That the defendant subsequently ordered Smith & Pride to purchase for him the stocks described in the account filed with the declaration, and that Smith & Pride ordered the said New York Stock and Produce Clearing House Company, Limited, to purchase, and the said company in good faith did purchase and hold for delivery said stocks and at the prices charged in said account of which purchases and prices the defendant had notice and to which he assented.   Sixth.  That Smith & Pride made cash payments upon the contract prices for the purchase of the said stocks, and that the said company in good faith bought and held the stocks ready for delivery upon the payment of the balance of the contract price, and that defendant was notified thereof.   Seventh.  That said stocks from time to time declined in market value beneath the market price of their purchase, and that the defendant was notified thereof, and that from time to time the defendant requested Smith & Pride to make cash advances for him, and to lay out and expend certain moneys to protect his said stocks by keeping their market value up to the contract price of their purchase.   Eighth.  That Smith & Pride from time to time did make cash advances and lay out and expend money, and paid the same at the request of the defendant to the said company upon the de-

cline in the market value of the said stocks from their contract price. Ninth. That the defendant was notified that the stocks had declined in the market value more than the amount of the payments made on their contract price. Tenth. That the defendant failed and refused after notice of the decline in the market value of the said stocks to pay the moneys necessary to keep the market value of the said stocks up to the contract price. Eleventh. That, thereupon, on the 12th of November, 1890, the said stocks were in good faith sold for their full market value at the prices set forth in said account filed with the declaration. Twelfth. The plaintiff is entitled to recover. Thirteenth. And their verdict may be for such sum as the jury may find from the evidence that Smith & Pride advanced, paid, laid out and expended at the request of the defendant, for the protection of the defendant's stocks as aforesaid, together with the commissions of Smith & Pride as brokers, and interest may be allowed in the discretion of the jury upon such sum as the jury may find from the evidence that Smith & Pride advanced at the request of the defendant. (Granted.)

*Plaintiff's 2nd Prayer.*—If the jury shall find from the evidence that Joseph S. Smith and Harvey Pride in May, 1890, were partners, trading as brokers, and if the jury shall further find that while so trading they in good faith entered into an agreement in writing, offered in evidence with the New York Stock and Produce Clearing House Company, Limited, for the purchase and delivery of stocks, and shall further find that defendant had knowledge of the terms of said agreement, and shall further find the defendant requested Smith & Pride to purchase his stocks through the said New York Stock and Produce Clearing House Company, Limited, and shall further find that Smith & Pride in good faith ordered the said New York Stock and Produce Clearing House Company, Limited, to purchase the said stocks and shall further find that said New York Stock and Produce Clearing House Company, Limited, purchased the said stocks for said Smith & Pride at and for the prices

named in the account filed with the declaration, and shall further find that the New York Company held the said stocks in their possession for delivery upon payment of the price of said stock, and shall further find that the said Smith & Pride made partial payment on said stocks to the said New York Company, and shall further find that the defendant from time to time requested the said Smith & Pride to advance moneys for him to protect his said stocks, and shall further find that in consequence of such request Smith & Pride deposited to the credit of the said Stock and Produce Co., any sum or sums of money for the purpose of protecting said stocks according to the terms of the contract of purchase, and shall further find that the defendant failed and refused to put up money sufficient to keep the said stock up to the contract price, and shall find that the said stocks declined below the contract price and that said stocks were sold on November 12, 1890, at the fair market price, then the plaintiff is entitled to recover such sum as the jury may find that Smith & Pride had laid out and expended in said contracts on behalf of the defendant, and interest may be allowed thereon in the discretion of the jury. (Rejected.)

*Defendant's 1st Prayer.*—That there is no legally sufficient evidence from which the jury can find that the stocks mentioned in the account in this suit are the same stocks mentioned in the testimony of the witness, C. H. Platt, as having been purchased by the New York Stock, &c., Co., and that their verdict must be for the defendant. (Rejected.)

*Defendant's 2nd Prayer.*—That if it was mutually understood between the defendant and Smith & Pride when the alleged orders to buy the stocks mentioned in the account was given by the defendant to Smith & Pride, that said transactions were in fact and were understood and intended by Smith & Pride and the defendant to be a dealing in the rise and fall of the market prices of said stocks, and that the stocks were not intended by them to be bought in fact for delivery to the defendant, and that the difference in the

rise and fall of said market prices of said stocks and the profits or losses, as the case might be, was to be settled and adjusted between said Smith & Pride and defendant by the payment by Smith & Pride to defendant of the amounts of any rise in said market prices of said stocks, and by payment by defendant to the said Smith & Pride of the amounts of any losses on account of any fall in said market prices, then the plaintiff cannot recover.   (Granted.)

*Defendant's 3rd Prayer.*—That there is no legally sufficient evidence in this case of that the contract was executed between Smith & Pride and the New York Stock and Produce Clearing House Company, Limited, mentioned in the evidence taken under the commission, and as stocks are by plaintiff's witness, Platt, testified to have been bought subject to the terms of such a contract, the evidence of said Platt cannot be considered by the jury and the verdict of the jury must be for the defendant.   (Rejected.)

*Defendant's 4th Prayer*—That there is no evidence in this case from which the jury can find that the contract between plaintiffs and the New York Co., under which the defendant ordered the stocks in suit to be purchased was the same contract under which said stocks were purchased by the New York Co., and their verdict must be for the defendant. (Rejected.)

*Defendant's 5th Prayer.*—That there is no evidence legally sufficient from which the jury can find that the stocks in the *nar.* and account filed in this case were kept in the possession and control of the New York Stock and Produce Clearing House Co., Limited, from the dates of the purchase of same until November 12, 1890, and the verdict of the jury must be for the defendant.   (Rejected.)

*Defendant's 6th Prayer.*—That the plaintiffs must show by proof that the stocks in question in this case were actually purchased under the direction of Smith & Pride by the New York Stock and Produce Clearing House Company, Limited, at fair market prices on the several days of purchase, and that said company actually paid the purchase money there-

for, and that the plaintiffs has given no such proof, and the verdict must be for defendant. (Rejected.)

*Defendant's 7th Prayer.*—That the plaintiffs must show by proof that the stocks in this case mentioned were actually purchased under the direction of Smith & Pride by their agent, the New York Stock and Produce Clearing House Company, Limited, at their fair market prices on the several days of purchase, and that said Smith & Pride actually paid the purchase money therefor, and that no such proof has been given, and the verdict must be for defendant. (Rejected.)

*Defendant's 8th Prayer.*—That under the pleadings and all the evidence the plaintiff has shown by proof no right to recover, and the verdict of the jury must be for defendant. (Rejected.)

*Defendant's 8 1-2 Prayer.*—That there is no sufficient proof that the stocks in question in this case were actually and *bona fide* purchased by the New York Stock and Produce Clearing House Company, Limited, and that the purchase money therefor was actually paid, and that said stocks were taken into the possession of said company and that the verdict must be for defendant. (Rejected.)

*Defendan's 9th Prayer..*—That if the jury shall believe from the evidence that the usual course of business of plaintiffs was to buy stocks only on margins and to deal in the rise and fall of the market prices of stocks, and that the stocks bought were not in fact to be delivered and paid for at all, and that the dealings in this case with defendant were had and done in the same way as was the usual course of their business, then such dealings constituted gambling transactions, and the verdict of the jury must be for defendant. (Granted.)

*Defendant's 10th Prayer.*—That if the jury believe from all the evidence that at the time the defendant ordered the firm of Smith & Pride to purchase for him the stocks mentioned in the account and *nar.* in this case it was understood between the defendant and said firm of Smith & Pride that

said stocks were not intended to · be delivered to the defendant, then their verdict must be for the defendant. (Rejected.)

*Defendant's 11th Prayer.*—That if the jury believe that at the time the defendant ordered the firm of Smith & Pride to purchase for him the stocks mentioned in the account and *nar.* in this case it was understood between the defendant and the said Smith & Pride that said stocks were not intended to be delivered to the defendant and their verdict must be for the defendant; although the jury may believe that at the times when the defendant gave the orders for said stocks he knew of the terms of the contract between the New York Stock and Produce Clearing House Company and Smith & Pride mentioned in the evidence, and that he directed the said Smith & Pride to buy said stocks from or through said New York Company, and that said New York Co. did actually buy and take into their possession said stocks and held the same for delivery to Smith & Pride under the terms of said contract, and that the said Smith & Pride made advances of money on account of said stocks to said New York Company, at the request of the defendant, and that said stocks were sold out by said Smith & Pride or said New York Company upon failure of the defendant to keep up the market prices thereof. (Rejected.)

*Defendant's 12th Prayer.*—That plaintiff has given no legally sufficient evidence tending to prove the alleged sale of the stocks in question in this case on the 12th of November, 1890, and loss sustained at or by said said sale entitling him to a verdict for any sum or sums of money in this case. (Rejected.)

*Defendant's 13th Prayer.*—That if the jury believe from the evidence that when the defendant gave to Smith & Pride the several orders for the purchase of stocks mentioned in the account in this case, it was mutually understood between Smith & Pride and the defendant that there was to be no actual delivery to the defendant of the stocks ordered to be bought; but that all of said transactions in stock were to

be settled and adjusted by the payment or receipt, as the case might be, by the defendant, of the differences between the prices at which said stocks should be bought and at which they should be sold, then the plaintiff is not entitled to recover, even though the jury shall further find that said Smith & Pride did actually purchase said stocks, through their agents in New York, and offered to deliver the same to the defendant. (Granted).

*Defendant's 14th Prayer.*—That there can be no verdict for the plaintiffs unless the jury shall believe from the evidence the New York Stock and Produce Clearing House Company, Limited, actually bought for Smith & Pride on account of defendant the stocks in plaintiff's account mentioned at the dates in said account mentioned, and paid the purchase money therefor, and took the same into their possession for and on account of said plaintiffs for defendant's account, and during the whole period, from the time of said purchase up to the 12th day of November, retained possession of same, and had during all said time the same ready to deliver to plaintiffs for defendant upon payment by defendant only of balance of purchase money after crediting the amount of margins received by said New York Company, interest from November 1st and commissions. (Rejected).

*Defendant's 15th Prayer.*—That if jury shall believe from the evidence that the New York Company, mentioned in evidence, actually bought the stocks in plaintiff's account mentioned at dates therein named on plaintiff's account for defendant, and held the same in their possession from said dates until November 12, 1890, but did not intend to deliver the same unless interest on the purchase price of said stocks, less margins already paid, was paid on same from the dates of said purchase until said delivery, then the verdict of jury must be for defendant. (Rejected).

*Defendant's 16th Prayer.*—That if the jury shall believe from all the evidence that the New York and Produce Clearing House Company, Limited, did actually buy the

stocks in the plaintiffs' *nar.* and accounts filed therewith at the several dates therein mentioned, and did actually pay the purchase money therefor and entered the orders for said stocks on its books at said dates, but did not deliver or offer to deliver the same, and held itself ready to buy in New York other like stocks in case an actual delivery of said stocks were called for by said Smith & Pride, provided the purchase price for same was first paid to said New York Company or deposited in bank to its credit by said Smith & Pride before said stocks were actually bought, the verdict must be for the defendant.  (Granted.)

*Defendant's 17th Prayer.*—That there can be no verdict for plaintiff in this case unless the jury shall believe from the evidence that the New York Stock and Produce Clearing House Company, Limited, actually bought for Smith & Pride on account of the defendant the stocks in plaintiffs' account mentioned at the dates in said account set out and took the same into their possession for and on account of said plaintiffs for defendant's account and during the whole period from the time of said purchases up to the 12th of November, 1890, retained possession of same and had during all said time the same ready to deliver to plaintiffs for defendant upon payment by defendant only of the balance of purchase money, interest from November 1st and commissions.  (Granted.)

*Defendant's 18th Prayer.*—That unless the jury believe from the evidence that the stocks mentioned in this case were actually purchased by the New York and Produce Clearing House Company and were in the possession of said New York Company from the dates of purchase of the same to the 12th of November, 1890, and ready to be delivered to Smith & Pride for the defendant upon the said Smith & Pride complying with terms of said contract to the said New York Company, their verdict must be for defendant.  (Granted.)

*Defendant's 19th Prayer.*—If the jury find from the evidence that the entire capital of said Smith & Pride was

$21,000, and that at the time of the transactions in this case, given in evidence, they were carrying on dealings in the purchase of stocks to an amount exceeding $300,000, said facts may be considered by the jury as tending to prove that the transactions in this case were not for the actual and *bona fide* purchase of the stocks in question. (Granted.)

*Defendant's 20th Prayer.*—That the burden of proof is on the plaintiff to prove that the purchases of the stocks in question in this case were actually and *bona fide* made for the purpose and with the intention of delivering of said stocks by the sellers thereof to the purchasers, and, no such proof having been given, the verdict must be for defendant. (Rejected.)

*Defendant's 21st Prayer.*—That if the jury shall believe from all the evidence that the usual course and custom of plaintiff's business was to deal only in margins and upon rise and fall in the market prices of stocks, and with no intention to deliver any stocks; and shall further find that the transactions of plaintiffs had with defendant were of the same kind as he usually had in his business, then such transactions constitute gambling transactions in law, and if the jury find that plaintiffs paid the New York Stock and Produce Clearing House Company, Limited, any money for and on account of transactions had by plaintiffs in the said New York House for and on account of defendant, and that such payments were made in pursuance of requests made by defendant to plaintiffs in course of such transactions to keep up and protect defendant's stocks, then the verdict of jury must be for defendant. (Granted.)

*Defendant's 22nd Prayer.*—That if the jury shall believe from the evidence the contract of purchase between plaintiffs and defendant was that stocks should be bought by plaintiffs for defendant only on margins, and only the difference between the rise and fall of the market values of said stocks should be dealt in, and that stocks were not to be delivered under the agreement between plaintiffs and defendant, then the verdict of the jury must be for defendant,

even though the jury shall believe from the evidence that said stocks were ordered to be bought by defendant, with knowledge of the contract of July 5, 1890, with the New York House, and that said stocks were purchased by said New York Company, and advances were made by plaintiffs as testified to. (Granted.)

*Defendant's 23rd Prayer.*—That if the jury shall believe from the evidence that the usual and customary way of plaintiffs' carrying on business was to deal only in margins and upon the rise and fall in the market prices of stocks, and with an understanding with his customers that no stocks were in fact to be delivered, and that plaintiffs' dealings with defendant were done in the way that he usually dealt with his customers, then the verdict of the jury must be for defendant, even though the jury should believe from all the evidence that plaintiffs likewise showed to defendant the contract of July 5, 1890, with the New York Stock and Produce Clearing House Company, Limited, and told him he executed orders through said House and under said contract ; and even though the jury should further believe that defendant requested Smith & Pride to buy through said House, and even though the jury should further believe that plaintiffs paid money on account of the said stocks in evidence mentioned, to the New York House in consequence of a fall in stocks carried by said New York House for plaintiffs on account of defendant, and even though the jury shall further believe that defendant requested plaintiffs to protect his stocks. (Rejected.)

*Defendant's 24th Prayer.*—If the jury find from the evidence that at the time of the alleged showing to defendant of the contract of the 5th of July, given in evidence, said Smith & Pride, or said Smith told to defendant that said New York Stock and Produce Clearing House Company, Limited, had a capital of $100,000, fully paid up, and was reliable and good, and that at said time said Smith or Smith & Pride had no knowledge in respect to either the alleged capital of said company or of the reliability thereof, and that

they or either of them applied to the Commercial Agency of Dunn & Co. for information in respect to the financial standing and reliability of said New York Company, and in reply were told that said Dunn & Co. had no knowledge or information on the subject, but would inquire and they or either of them afterwards applied to said Dunn & Co. for the information promised in reply to said inquiry, and that the defendant was induced by the said representations to give the orders in evidence.    The said facts taken in connection with the proof given by the witnesses Burknett and McClave; if the jury believe the same was competent evidence tending to prove that the said alleged contract of the 5th of July was a device for the purpose of disguising an illegal or gambling contract.    (Rejected.)

The Court below (STAKE, J.), granted the plaintiff's first prayer and rejected his second.    And granted the defendant's 2nd, 9th, 13th, 16th, 17th, 18th, 19th, 21st and 22nd prayers and rejected all the other prayers of the defendant.

The jury returned a verdict for the plaintiff for $8,129.65, and from the judgment thereon the defendant appealed.

The cause was argued before McSHERRY, C. J., BRYAN, BRISCOE, PAGE and BOYD, JJ.

*William P. Maulsby* and *William H. Thomas* for the appellant.

This suit was brought under the Act of 1890, ch. 136, and with the declaration was filed the account as the cause of action as required by sec. 16 of the Act.    The case made out by the proof is totally different from that presented by the pleadings.    The plaintiff states that the defendant ordered Smith & Pride, brokers, to buy for him, through the N. Y. Company, the stocks mentioned in the account filed with the declaration; that when Smith & Pride received the orders to buy said stocks they telegraphed over to New York to the N. Y. Company and bought said stocks for the

defendant; that the defendant was to put up or pay to Smith & Pride margins on said stocks, to keep the stocks up to contract prices; that the defendant requested Smith & Pride to protect his stocks; that Smith & Pride did protect said stocks until they were sold out on November 12th, 1890, because Cover failed to pay margins to keep up the contract price of said stocks, and that the $6,741.00 sued for is money paid by Smith & Pride to the New York Company, at the request of the defendant, to protect said stocks and to keep up the contract price. Here is a fatal variance. *I Poe P. & P.*, p. 612–17.

Taking the case upon the plaintiff's proof, the contract between Smith & Pride and the defendant was simply a method of carrying out a gambling arrangement. Plaintiff says : " That according to the understanding between Smith & Pride and the defendant, at the time when the several stocks in this case were ordered to be bought, the defendant was to put up a certain amount to keep the stocks up to the contract price; that he was first to put up one per cent., called margin, to keep the stocks up to the contract price, to protect the plaintiff from loss." In case the market price of the stocks advanced above the market price of the stocks on the day they were ordered to be bought, and the defendant ordered them sold out, the plaintiffs were to pay the defendant the difference between the price at which they were purchased and the price he sold them out at, less plaintiff's commissions of one-fourth per cent., and in addition, in cases where he sold out at a profit, defendant would get back any margin he may have put up. In case the stocks declined in the market price, and they were sold out, " defendant would get the difference between the price which they were down to, up to the price they were sold out at;" "that commissions for both buying and selling was one-fourth per cent., one-eighth for buying and one-eighth for selling, and that he, witness, added this commission to the purchase price of the stocks at the time they were purchased, and included the same in the account handed to

the defendant, as was done with his other customers, on a paper similar to paper marked ' S. & P.' " " That the price wired from New York was the actual purchase price of the stock, and that the commissions of one-fourth per cent. was added when he sent to customers tickets fac simile of ' S. & P.' "

This contract between Smith & Pride and the N. Y. Company, which was evidently intended as a cloak for gambling transactions, notwithstanding Mr. Platt says that it was intended as a. trap for dishonest men, is confidently relied upon by counsel for plaintiff to extricate them from the dilemma in which plaintiff's proof has placed them. Yet, when read in connection with the plaintiff's statement as to the understanding between Smith & Pride and defendant, and his explanation of the purpose of the margins, and the statement of witness, Platt, as to the right to sell if stocks declined, the 3d paragraph of said contract, in regard to the sale of the stock, in case the advance or decline of the market price, beyond the contract price, exceeded or equaled the cash credits, &c., presents exactly the same proof passed on in *Billingslea* v. *Smith & Pride*, page 519, where the Court says, " if the margin was such as stated in defendant's testimony, this agreement was simply a method of carrying out a gambling engagement. If the margin was such as described by Smith, the result would not be different if we take into consideration the remaining portion of the prayer, about selling the stock when it declined below the contract price."

· Supposing the contract between the plaintiffs and defendant to be that the plaintiffs should purchase the stocks for the defendant without any qualification, then the plaintiffs, to entitle them to recover, must show that the stocks were actually purchased under their direction by their New York agents at their fair market price, on the day of purchase ; that they or their New York agents had said stocks in their possession so that they could be delivered to the defendant upon his paying the purchase money therefor ; that they

notified the defendant of the purchase, and requested him to receive the stock and pay them the price they had paid for it, with their commissions ; that, at the time of this notice, they were in condition to deliver the stock by having the stock or other *indicia* of title actually in hand or in the hands of their agents ; that, on the failure of the defendant to receive the stock, they, after notice to the defendant, directed it to be sold ; and that it was sold by their agents, either at public sale in market overt, or at a sale publicly and fairly made at the Stock Exchange, or a Stock Board, or a Board of Brokers, where such stocks are usually sold, at a fair market value on the day of sale. *Rosenstock* v. *Tormey*, 32 Md. 169 ; *Worthington* v. *Tormey*, 34 Md. 182 ; *Price and wife* v. *Gover et al.*, 40 Md. 102 ; *Billingslea* v. *Smith & Pride*, 77 Md. 518.

The only proof offered as to the purchase of these stocks was the evidence of Charles H. Platt, taken under the commission. In answer to the twelfth interrogatory, "Are you able to state what transactions you had with plaintiffs in the fall of 1890, dating from the 18th day of Sept. to the 12th day of Nov., 1890? said witness, after refreshing his recollection from the books of the company, gives a statement of the transactions with the plaintiffs between said dates. He does not say that these were the same stocks ordered to be bought for the defendant, and could not say so, for the defendant was not known to him or his company, in the transactions between his company and the plaintiffs. Whether the stocks mentioned by the witness as having been bought by his company for the plaintiffs, are the same stocks ordered to be bought by the defendant, or even the same that are charged in the account filed with the declaration, remains, so far as the record in this case discloses, a matter of conjecture. Especially is this so when said witness gives, in answer to a similar interrogatory in the case of said plaintiffs against Billingslea, a list of transactions between his company and the same plaintiffs, covering a portion of the same period. If the list which

said witness gives contains, as he says, all the transactions between his company and the plaintiffs, between Sept. 18th and Nov. 12th, 1890, then there was certainly not enough stocks bought by his company for the plaintiffs to fill the orders of both Billingslea and Cover, independent of the numerous other customers of the plaintiffs, whose orders were filled, according to the proof of the plaintiff, during the same period, by said N. Y. Company. Were these stocks purchased and held by the N. Y. Company, for delivery to the defendant, upon his paying the purchase price of said stocks? Witness Platt says, that after holding them for several days, his company gave notice to the plaintiffs, by letter, that all said stocks were ready for delivery to them, &c." The only notice received by the defendant, according to the plaintiffs' proof, was the letter from the N. Y. Company, dated Oct. 27th, to the plaintiffs. If the stocks had only been held by the N. Y. Company for several days before said notice, then all of Cover's stocks were certainly not purchased on the day they were ordered to be purchased or were reported to have been purchased, for most of them were ordered and reported to have been purchased more than a month previous to said notice. Again, said witness Platt states that these stocks were purchased and held by his company for plaintiffs, under the terms of said contract. If they were so held, they were not held for delivery to the defendant, and to be delivered to him upon his paying the balance due thereon, for, by the terms of said contract, they were held liable to be sold by said company at any time, to meet any shortage of the plaintiffs on account of any other stocks held by said company for the plaintiffs.

Where in the record do you find any proof that said stocks, to use the language of JUDGE MILLER in *Rosenstock* v. *Tormey*, "were actually sold by said N. Y. Company, either at public sale in market overt, or at a sale publicly and fairly made at the Stock Exchange or Stock Board, or a Broker's Board, where such stocks are usually sold at

their fair market value ? " Platt does not state where they were sold, but merely that they were sold at the regular Stock Board price. Therefore, the defendant's first, fifth, eighth and twelfth prayers should have been granted.

*Harry M. Clabaugh, Attorney-General,* and *John Henry Keene, Jr.* (with whom was *Alexander Armstrong* on the brief ), for the appellee.

The Court will find, with scarcely a material variance, that these forty-nine exceptions and twenty-nine prayers represent questions which this Court has substantially determined in a former controversy between this appellee and one Billingslea, 77 Md. 504. The difference between the name of the appellant in this cause and that of the appellant in *Billingslea* v. *Smith & Pride*, presents the substance of the dissimilarity between the two causes. In *Billingslea* v. *Smith & Pride*, bottom of page 513, this Court paid scarcely more than the cold tribute of passing glance at the " thirty-one exceptions taken to the evidence, and dismissed all of them (except one as to the commission), saying at the conclusion, bottom of page 516, " It is sufficient to say that we see no error in the other rulings in the evidence," that is, those against which the thirty-one exceptions were levelled.

In support of plaintiffs' prayer, which was granted, we rely upon *Rosenstock* v. *Tormey*, 32 Md. 169 ; *Worthington* v. *Tormey*, 34 Md. 183 ; *Price* v. *Gover*, 40 Md. 102 ; *Appleman* v. *Fisher*, 34 Md. 540 ; *Dos Passos on Stock Brokers*, 415 and 419 ; *Bigelow* v. *Benedict*, 70 N. Y. 202 ; *Ward* v. *Vosburg*, 31 Fed. Rep. 12 ; *Cooke on Stock and Stockholders*, note to sec. 3412.

The real issue was not whether the appellant was speculating in stocks, but, if with a general knowledge of this fact, the appellees had so far participated as to make them sort of accessories before the fact, and so accessorial to his guilt as to visit upon themselves the disability which the law attached to the crime. This prayer, instead of making

the guilty knowledge of the appellees a barrier to their recovery, made even " good faith and *bona fides*" in the actual purchase of the stock, another and insuperable obstacle to their right of recovery. The appellee voluntarily assumed this burthen, which the law did not attach to him—but not only was *bona fides* to be observed, but it required the jury to find the actual possession of the stock to have been in their possession and ready for delivery and its tender upon payment of the contract price. The proof was that the offer was to deliver the stock to any party in New York whom the appellant would name and the actual cash deposit of the amount of the decline by the appellee.

If his original undertaking was for gambling in stocks, the purchase of the stock and its tender was wholly inconsistent and irreconcilable with any such fraudulent device, and defeated *eo instanter* the contemplated fraud. For if the stock was actually purchased, held and ready for delivery, how could the plaintiff have intended to settle at the price for which it was bought and sold? Gambling contemplated neither purchase nor delivery. The purchase and delivery precluded the possibility of a mutual intent to wager and settle in money. The purchase defeated the mutuality of the conspiracy, if such there was, and thus the appellant was immeasurably benefited by the Court granting his prayers. A transaction which on its face is legitimate cannot be held void as a wagering contract by showing that *one party* only so understood and meant it to be. The proof must go further and show that this understanding was mutual. *Bibb* v. *Allen*, 149 U. S. 481. If the dealings are under a contract *or option to buy* or sell at a future day, they are gambling transactions and illegal, but if they are contracts for absolute delivery of the grain, they are valid. *White* v. *Barber*, 123 U. S. 392. The contract which the law condemns is wherein the parties stipulate that they shall gain or lose upon the happening of an uncertain event in which they have no interest except that arising from the possibility of such gain or loss. When a

broker is privy to the unlawful designs of the parties and brings them together for the purpose of entering into an illegal agreement, he is *particeps criminis* and cannot recover for services rendered. *Embrey* v. *Jamison*, 131 U. S. 336.

Boyd, J., delivered the opinion of the Court.

This action was brought by the firm of Smith & Pride, and, Mr. Pride having died while it was pending, the appellee, as the surviving partner of the firm, prosecuted the case and recovered judgment against the appellant for a balance alleged to be due on transactions between them, arising out of the purchase of certain stocks in the months of September, October and November, 1890. In the course of the trial forty-six exceptions were taken to the rulings of the Court in admitting or rejecting evidence offered. After the testimony was concluded the plaintiff offered two prayers and the defendant twenty-five; one of the former was granted and fifteen of the latter were rejected, and the action of the Court as to them is brought before us for review by another bill of exceptions. Although the exceptions are thus numerous, the questions presented can be classified so as to materially reduce the number to be passed upon and the main principles involved have been so thoroughly settled by the decisions of this Court as to relieve the case of any great difficulty beyond the labor required in ascertaining from a confusingly voluminous record the material points passed on by the Court below. In order that we may see what the real controversy between them is, it will be well to refer in the beginning to portions of the testimony of the parties to the suit.

The appellee testified that he and his partner were stock and grain brokers in Baltimore, and that between the 18th of September and the 6th of November, 1890, they bought for the defendant, through the New York Stock and Produce Clearing House Company, Limited, the stocks mentioned in the account filed with the *narr.*; that his firm had a contract for the purchase of stocks with that company

which they showed defendant, who told them to buy the stocks for him from that company, and that they were purchased under the terms of that contract. He also said that the defendant paid at the times of the purchases what are called "margins," and agreed to pay such additional margins as were necessary to keep the stocks to the contract price until the purchase money was paid, when they were to be delivered; that the defendant requested them from time to time to pay to the New York Company the necessary margins, which they did until November 12th, 1890, when they were sold by the New York Company by reason of the failure of the defendant to pay as agreed. The plaintiff claimed, and the evidence offered by him tended to prove that there was an actual sale of the stocks with the understanding that they were to be delivered on payment of the contract price, together with such other sums as might be due for advances made, etc. It was not claimed by him that his firm had the stocks in their own possession, but that they ordered them from the New York Company, at the request of the defendant, and that company purchased and held them ready to be delivered upon payment of the balance of the purchase money. The defendant flatly denied that there was any such agreement, but alleged that "We were to deal on margins altogether. The plaintiffs were to buy no stocks for him and he was to pay for none * * * That it was understood that there should be no delivery of stocks and no stock bought for delivery; that it was purely a marginal business between them."

It will thus be seen what the main controversy was and that the difference between the parties as to the character of the transaction was sharply defined, but as we will hereafter have occasion to refer more particularly to some of the other evidence offered, we will not now do so, but will proceed at once to the consideration of the exceptions.

As it will be necessary in passing on some of the questions raised to examine all the evidence properly in the record, we will consider at once the objections urged against

the admissibility of the testimony of Charles H. Platt, which are presented by the 17th to the 28th, inclusive, of the bills of exception.   On August 10th, 1891, leave was granted to the plaintiff by the Circuit Court for Carroll County, where this suit was originally instituted, to issue a commission to take testimony.   Interrogatories to be propounded to P. H. Platt, of the city of New York, were filed by the plaintiffs and served August 17th, 1891, on the attorneys for the defendant, together with the name of Gilbert Elliott, as the commissioner suggested by the plaintiff.   On August 25th exceptions were filed to some of the interrogatories on the ground that they were immaterial, irrelevant, etc., but no commissioner was named by the defendant.   On October 19th, 1891, a commission was issued to Elliott authorizing him to examine P. H. Platt.   On the 30th of November, 1891, the commission and the return of evidence taken by Elliott were filed, by which it appears he had taken the deposition of C. H. Platt, and it was signed Charles H. Platt.   On February 1st the plaintiff's attorneys served on the defendant a notice that the commission had been returned and opened.   The defendant then filed exceptions to the issuing of the commission on the ground that it had been issued to one commissioner, and for other reasons particularly set forth and to the execution and return of the commissions upon various grounds which we will not recite, as they have not been urged in this Court.

As the defendant received notice of the commissioner proposed by the plaintiff, his failure to name another must be considered a waiver of his right to have two commissioners and a consent to the execution of the commission by the one named.   *Billingslea* v. *Smith & Pride*, 77 Md. 516.   But it is contended that the evidence of Charles H. Platt was inadmissible because the commissioner was authorized to take the testimony of P. H. Platt and not Charles H. Platt, and this objection to his evidence was the one mainly relied on in the argument.   The interrogatories filed by the plaintiff show upon their face that they were intended

to be propounded to a man named Platt who was connected
with the New York Stock and Produce Clearing House
Company, Limited. There is not the slightest intimation
that the defendant was in any way misled by calling the
witness, P. H. Platt, instead of C. H. Platt. On the con-
trary, the record shows that although numerous exceptions
were filed to the issuance, execution and return of the com-
mission, no objection was made, for the reason we are now
considering, until at the trial of the case, which took place
in April, 1894. The rule of the Circuit Court for Carroll
County, from which the commission issued and to which it
was returned, provided that " If a commission shall have been
returned and opened and notice thereof given to the opposite
party ten days before the commencement of the term, excep-
tions to the execution and return thereof shall be filed the 3rd
day of the term or they shall be considered as waived." This
notice was served, as above stated, on the 1st of February,
1892. It is manifest that the object of the rule is to pre-
vent injustice being done by having objections raised to the
execution and return of the commission when it is too late
to correct it without at least continuing the case. If the
Court could see that a party to a suit had been misled, in-
tentionally or otherwise, by such a mistake as this, in the
name of the witness to be examined, it should undoubtedly
remand the commission if a reasonable application be made,
but without deeming it necessary to determine whether the
evidence taken under such circumstances should be ex-
cluded, even on a timely application, unless the opposing
party had been, or might have been injured, we think the
Court was clearly right in not rejecting this evidence by
reason of a misnomer of the witness Platt, as it was too
late to raise the objection. We cannot agree with the
learned attorneys for the appellant that the objection does
not go to the execution and return of the commission, but
to the admissibility of the evidence itself. If it be inadmis-
sible because the commissioner took the deposition of C. H.
Platt instead of P. H. Platt, that must necessarily affect the

execution of the commission, for if appellant's contention be right, the commissioner was not authorized to take or return the evidence of C. H. Platt under that commission. If the testimony of C. H. Platt be competent, material and relevant to the issues, it could only be rejected because it had not been taken in some authorized way. The objection to the commission goes far beyond such questions as the relevancy or materiality of the testimony. It was to the effect that it was not evidence at all, because Elliott had no power to take it, and he had not executed the commission in the manner authorized by the Court. It was therefore necessarily a question affecting the execution and return of the commission, and such objection should have been made as required by the rule of the Court, and not, over two years after it was returned, at the trial of the case. We think, therefore, that the evidence taken under that commission, so far as offered, was admissible, it being relevant and material, and the objections stated in these bills of exception were properly overruled.

. Having determined that the evidence of Platt was admissible, it will perhaps be better to consider the rulings of the Court on the prayers before passing on the other exceptions. In this age of speculation and tendency to deal in large transactions with but little capital invested by means of what are called " margins," it behooves the Court to apply vigorously the well established principles of law that forbid gambling in all forms and to refuse relief to those coming before them seeking to recover gains tainted with that crime. In many cases the rise and fall of prices of stocks are not controlled by their intrinsic value, but rather by the greed of those who are willing to ruin their fellows to enrich themselves. Courts cannot be unmindful of the fact that many devices and schemes are resorted to for the purpose of covering unlawful acts with the appearance of what is law. Sometimes such acts are easily detected, but frequently they are so adroitly hidden by what seems fair and permissible, as to make it difficult to unmask them, but

when possible they should be exposed. Until, however, the Legislature sees fit to pass more stringent laws on the subject, we must rely mainly upon juries to require clear proof that transactions of this kind have been kept within the law, as the Courts can only instruct them as to what the law is, and they must find the facts. This record does not present a state of affairs entirely free from suspicion that there was an effort to evade the law, which requires the purchase of stocks to be made with the understanding that they were actually to be delivered and paid for, but this question seems to have been fully submitted to the jury by the prayers of the defendant which were granted, some of them going beyond what he had a right to demand. By the second prayer the jury was instructed that if they believed it was mutually understood between the defendant and Smith & Pride, when the orders to buy were given, " that said transactions were in fact, and were understood and intended to be a dealing in the rise and fall of the market prices of said stocks, and that said stocks were not intended by them to be bought in fact for delivery to the defendant, and that the difference in the rise and fall of said market prices of said stocks and the profits or losses as the case might be, were to be settled and adjusted between said Smith & Pride and defendant by the payment by Smith & Pride to the defendant of the amounts of any rise in said market prices of said stocks, and by payment by defendant to the said Smith & Pride of the amount of any losses on account of any fall of the said market prices, then the plaintiff cannot recover." By the thirteenth they were instructed that the plaintiff could not recover if they found the facts therein stated, which are in substance the same as those in the second, " even though the jury shall further find that said Smith & Pride did actually purchase said stocks through their agent in New York and offered to deliver the same to the defendant." The ninth, sixteenth, seventeenth, eighteenth, nineteenth, twenty-first and twenty-second, which can be found in the statement of facts in the case, together

with the second and thirteenth already referred to, seem to have covered the defendant's theories of the case fully.

The only prayer offered by the plaintiff which was granted was clearly a proper instruction under the evidence. In the case of *Billingslea* v. *Smith & Pride*, 77 Md. 504, where the facts were very similar to those in this case, the Court held that when the contract is that in case of a decline in the market price of the stocks the purchaser is to pay the difference between the contract price and the market price, and there is no intention that he shall receive and pay for the stock itself, the dealing is a gambling contract, and the law does not permit an action to be maintained upon it, but also said, on page 520, " There was evidence competent to show that the plaintiffs were buying stock for defendants from the New York Company, and that he knew the terms of the contract between the plaintiffs and the said company, and that having this knowledge he requested them to protect his stocks   *   *   If the jury found these facts they might infer that the defendant approved of the terms upon which the stocks were purchased under the contract between plaintiffs and the New York Company, and that at his request plaintiffs made advances in cash, or by engagements to pay cash, which he afterwards performed to protect the stocks according to the terms of their contract of purchase. If these facts had been found by the jury, the plaintiffs would have been entitled to a verdict for the amount of their advances on the count for money paid for the defendant at his request; provided the stocks were actually bought by the New York Company and held by it for delivery according to the terms of the contract   *   *   *   *   *   But of course the defendant would be at liberty to show, if he could, that the contract between the plaintiffs and the New York Company was a device for the purpose of disguising a gambling contract."

The defendant filed special exceptions to the second, fifth, sixth, eighth, eleventh and thirteenth paragraphs of the plaintiffs' prayer on the ground that there was no evidence

of the facts stated in them.    It is contended that there was no evidence whatever of the execution of the contract of July 5th, 1890, between plaintiffs and the New York Company, which is similar to the one referred to in *Billingslea's case, supra,* and will be found in the statement of facts.    The plaintiff, Smith, testified that the contract was made, that he had shown it to defendant, who ordered him to buy the stock from that company.    The testimony of the witness, Platt, tended to show that the company did in good faith purchase and hold for delivery the stocks at the price charged in the account and his evidence, as well as that of Smith, also tended to prove payments by Smith & Pride to the company at the request of the defendant.    In fact the defendant himself admits payments from time to time, and on November 7th he paid $600 in cash and gave the plaintiff his check for $1,797.38, which he did not pay.    There was ample evidence from which the jury could find that advances had been made by Smith & Pride for the defendant, leaving the balance claimed in this case.    Witness, Platt, swore that they closed out the stocks at the regular Stock Board prices for the full market prices.    There was, therefore, legally sufficient evidence of the facts submitted by this prayer, and if the jury believed them the plaintiff was entitled to recover.    It was for the jury to determine which of the witnesses were testifying truthfully and whether the contracts for the sale and delivery of the stocks were *bona fide.* On the statements furnished the defendant on each occasion when he made his purchases there was printed the following : " H. Pride & Company, brokers, will receive no business except with the understanding that the actual delivery of property bought or sold is in all cases intended, agreed and understood."    Whether that and the provisions in the contract with the New York Company were mere devices to aid in concealing the true nature of the transaction was also for the jury under the instructions of the Court.

The defendant's first, third, fourth, fifth, sixth, seventh, eight and a-half and twelfth prayers were properly rejected

because there was evidence of such matters referred to in them as were material. Some of them are objectionable on other grounds, but it is unnecessary to discuss them more fully. The eighth might be passed by without further comment, as we have already said there was evidence which justified the granting of the plaintiff's prayer, but it was argued at some length that this prayer raised the question of variance between the pleadings and the evidence and that such existed. It is a dangerous practice to permit such a question to be raised by a general prayer of this kind, as this Court cannot say that the attention of the Court below, or the attorneys for the plaintiff, was in fact called to the alleged variance so as to give an opportunity for amendment, if necessary, in that Court. But if we treat it as properly before us we cannot hold the objection valid. The declaration contains the common counts, including those for goods bargained and sold, work done and money paid by the plaintiff for the defendant at his request, and under them the evidence offered is clearly admissible, and if we regard the account filed with the declaration as having the effect of a bill of particulars regularly filed on the demand of the defendant, which may well be questioned, the evidence is not at variance with the statements in the account. The plaintiff claims that his firm bought for the defendant of the New York Company the stocks on the dates and at the prices named—that the defendant made certain payments with which he was credited and that on November 12th the stocks were sold out at the price named, leaving a balance of $6,741.00. The account might have been stated more in detail. It might have shown on its face that the stocks were brought from and sold by the New York Company, and that the balance was the amount paid by the plaintiffs for the defendant at his request, but if we take the account in connection with the count for money paid for the defendant at his request, it gave the defendant full and ample notice of the claim made against him. It states the charges and credits in the same manner that the

one in *Billingslea's case* did.   If the defendant needed further particulars he could have applied for a more detailed statement before pleading.    The tenth, eleventh, thirteenth, fourteenth, fifteenth and twenty-third prayers were in all material matters covered by the prayers that were granted.   The twentieth was properly rejected, as the burden was not on the plaintiff to prove what was therein stated and the twenty-fourth was clearly bad.

It would be a useless task to discuss in this opinion the numerous exceptions which were taken to the admission or rejection of evidence.   We have carefully considered them all and find no reversible error in them.   Many of them are settled by *Billingslea's case*, *supra*, some are wholly irrelevant to the issues in the case and others were corrected, if there was any original error, by the evidence being subsequently admitted, as shown in other parts of the record, thus giving the defendant the benefit of it.

We are of the opinion that the law was fairly and properly submitted and no error has been pointed out to us that would justify us in reversing the judgment.

*Judgment affirmed with costs.*

(Decided March 24th, 1896.)